MICHAEL BAILEY
United States Attorney
District of Arizona

MARK J. WENKER
Assistant U.S. Attorney
Arizona State Bar No. 018187
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona  85004-4408
Telephone: (602) 514-7500
mark.wenker@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>v.<br><br>$63,929.00 in United States Currency and $62,900.00 in United States Currency,<br><br>                    Defendants *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Fed. R. Civ. P. Supp."):

## NATURE OF THE ACTION

1.      This is a civil action *in rem*, brought to enforce the provision of 21 U.S.C. § 881(a)(6) for the forfeiture of United States currency which represents money or other things of value furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and money used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*

2.     This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of United States currency which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, including but not limited to dealing in a controlled substance and  to a violation of 18 U.S.C. § 1952, travel in interstate commerce with the intent to distribute proceeds of unlawful activity or to promote, manage,   establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity.

3.     Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j) and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action.  This Court has jurisdiction.  28 U.S.C. §§ 1345 and 1355 and 18 U.S.C. § 981(h).

## THE DEFENDANTS *IN REM*

4.     The defendants consist of $62,900.00 in United States Currency and $63,929.00 in United States currency ("Defendant Properties") seized on September 16, 2019.  The Defendant Properties are currently in the custody of the United States Marshals Service ("USMS").

## INTRODUCTION

5.     The following information depicts an investigation conducted by the members of the Phoenix Commercial Narcotics Interdiction Unit ("CNIU"), based out of the Phoenix Sky Harbor International Airport, to which Drug Enforcement Administration ("DEA") Special Agent William S. Neal ("SA Neal") is assigned.   The primary responsibility of this unit is to investigate crimes involving the use of commercial airlines and shipping companies to transport illegal drugs and drug proceeds.

6.     Based upon the experience of CNIU investigators and investigations across the country, it is common knowledge that cities located on the southeast coast are known demand locations for illicit drugs.  States such as Arizona and California are source locations due to their close proximity to the border of Mexico and established drug transportation routes.  People involved in the illegal drug trade often hire couriers to transport drugs and/or proceeds from the sale of drugs by utilizing commercial airlines and shipping companies.  In an effort to identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, suspicious flight itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

7.     Factors that constitute suspicious flight itineraries include airfare purchase at the counter immediately prior to departure or short notice reservations for a one-way travel, sometimes paid in cash.  Couriers travel with minimal or no luggage and often will attempt to board the aircraft at the last possible moment.  Drug and/or money couriers utilize these techniques in an attempt to conceal their identities from law enforcement authorities and minimize their exposure to commercial airlines.

## BACKGROUND

8.     On Monday, September 16, 2019, members of the CNIU received a "ticket tip" on the travel of an individual identified as passenger Bryan Morantes ("Morantes") who was travelling on a one-way ticket on American Airlines flight 1983 from Miami, Florida, to Sacramento, California, with a layover in Phoenix, Arizona.  The ticket tip was passed to the Phoenix CNIU by the DEA in Miami, Florida.

9.     The tip was initiated based on information from the DEA because the travel ticket was purchased within the previous 48 hours, one way, and because of the demand/source relationship of the travel itinerary.

10.     Members of the CNIU responded to the Phoenix Sky Harbor International Airport gate where the flight was due to arrive at approximately 8:59 a.m.

11.     CNIU investigators knew Morantes was seated in Row 31, Seat D, so he would be in the later wave of passengers to exit the flight.

12.     Prior to the flight's arrival, a photograph and physical description of Morantes was obtained via a law enforcement database.

13.     A criminal history query of Morantes revealed prior drug-related arrests.

14.     The flight arrived and the passengers began to exit the jet-way.

15.     Morantes was believed to be travelling with Alfredo Vasquez ("Vasquez").  CNIU investigators observed a male exit the jet-way, consistent with a passenger seated in row 31 who matched the description of Morantes.  Morantes waited in the concourse area and greeted another passenger who matched the description of Vasquez.

16.     Due to the demand/source location of the cities and the aforementioned information, SA Neal decided to make a consensual contact with Morantes.

17.     Morantes was carrying a backpack and a roller carry-on suitcase.

18.     SA Neal contacted Morantes in the concourse and introduced himself as a DEA investigator assigned to the Phoenix Airport, simultaneously displaying his credentials.

19.     Task Force Officer Richard Lamberto contacted Vasquez at the same time

SA Neal contacted Morantes.

***Interview with Bryan Morantes***

20.    SA Neal asked if SA Neal could see Morantes's boarding pass, and Morantes provided his boarding pass.  The name printed on the ticket was Bryan Morantes.

21.    SA Neal told Morantes he was one of the passengers SA Neal was looking for and explained to Morantes what SA Neal's duties are at the airport and that the reason for SA Neal's contact was based on Morantes's flight itinerary.

22.    Morantes was in a wide-open walkway and his ability to walk away was not obstructed if he chose to walk away from SA Neal.

23.    Morantes asked SA Neal if they could walk toward his connecting flight, and SA Neal advised Morantes that they could talk as they walked.

24.    As SA Neal and Morantes walked toward his connecting flight, SA Neal asked Morantes if the bags he had were his and Morantes responded that they were his bags.

25.    SA Neal asked if Morantes packed his bags and if everything he was carrying belonged to him, and Morantes responded that he packed the bags and everything was his.

26.    SA Neal asked Morantes if he was carrying any explosives or drugs, and Morantes replied he was not carrying any explosives or drugs.

27.    Without any request from SA Neal, Morantes told SA Neal that he could search Morantes's bag if SA Neal so desired.

28.    SA Neal asked Morantes if he had any large amounts of currency, Morantes hesitated, but then replied that he was not carrying large amounts of currency.

29.     SA Neal then asked Morantes if he had any currency, and Morantes stated he had about $4,000.00 in his backpack.

30.     SA Neal asked Morantes if SA Neal could take a look at his bags and Morantes agreed.

31.     SA Neal asked Morantes to step out of the walkway, so SA Neal could conduct the search and Morantes complied.

32.     SA Neal conducted a search of Morantes's roller bag while CNIU Detective Pablo DeSantiago ("Detective DeSantiago") assisted SA Neal and searched Morantes's backpack.

33.     Detective DeSantiago located a small bundle of money in the backpack.

34.     As SA Neal emptied the roller bag, Detective DeSantiago advised SA Neal to check the lining of the back of the roller bag because there was a bulge.

35.     SA Neal and Detective DeSantiago each placed one hand on the inside of the roller bag and the outside of the roller bag and both were able to feel that there was something hidden in the lining of the roller bag.

36.     Detective DeSantiago advised that there was something in there, but the suitcase would need to be taken apart to see what was hidden inside.

37.     SA Neal observed Morantes appearing very nervous.

38.     SA Neal asked Morantes if there was cash or drugs hidden in the roller bag, and Morantes said "no."

39.     SA Neal asked Morantes to go to the CNIU office to see what was hidden in the roller bag, Morantes agreed, and he walked with SA Neal and Detective DeSantiago to the airport CNIU office.

40.     Once in the CNIU office, SA Neal asked Morantes if he knew what was in the lining of his roller bag, but Morantes did not respond. SA Neal asked again and Morantes stated "yes."

41.     SA Neal asked Morantes to clarify if yes meant he did know what was in the lining of his roller bag or if he meant he did not know what was in the lining of his roller bag. Morantes did not respond.

42.     Money was found inside of Morantes's backpack and it was removed and photographed.

43.     Detective DeSantiago located tools in the CNIU office and assisted SA Neal by beginning to deconstruct the roller bag.

44.     SA Neal asked Morantes why he was going to Sacramento, and Morantes stated he was going to visit his uncle.

45.     SA Neal asked Morantes for his uncle's name, and Morantes said he did not know the name because he was not Morantes's real uncle.

46.     SA Neal asked Morantes how he knew Vasquez, and Morantes stated he knew Vasquez from school from a long time ago.

47.     Morantes advised he did not know why Vasquez was travelling with him to Sacramento.

48.     Morantes stated that when he told Vasquez he was going to Sacramento, Vasquez said he would go.

49.     SA Neal asked where they were going to stay in Sacramento, and Morantes advised they would get a hotel when they arrived in Sacramento.

50.     Morantes stated he did not know what hotel they would stay at, but they

have a few in Sacramento. Morantes could not name any hotels in Sacramento.

51. SA Neal asked Morantes how long they were going to be in Sacramento, and Morantes replied a couple of days or maybe a week

52. SA Neal asked if Morantes had a plan to return to Miami, and Morantes did not answer.

53. SA Neal asked what he was going to do in Sacramento, and Morantes did not answer.

54. A large amount of U.S. currency was found hidden in the lining of the exterior of the roller bag.

55. Morantes was asked if he put the U.S. currency in the roller bag, and Morantes stated he did not put it in there.

56. SA Neal asked Morantes "is that your money?" and Morantes said "yes."

57. SA Neal asked Morantes why he was carrying so much cash to Sacramento, and Morantes replied he was just going to "keep it out there, like stash."

58. SA Neal asked Morantes where he was going to stash it, and Morantes stated "I don't know."

59. Morantes then advised he was going to try to set up an account, and he was going to try to buy a house in the Sacramento area.

60. SA Neal asked Morantes what type of account, and Morantes stated a bank account.

61. SA Neal asked what bank he was going to set up the account with the currency, and Morantes advised he did not get that far yet.

62. SA Neal asked why Morantes did not open an account at a bank that has

branches in both Florida and California, and Morantes stated he was going to try to find a deposit box.

63.     Morantes said he was looking for a house in the $300,000.00 to $400,000.00 price range.

64.     Morantes said he had exactly $60,000.00 with him.

65.     Morantes stated he had looked at houses online, but he just got his phone, so he could not show SA Neal a picture of any houses he looked at and could not advise the address of any houses he looked at.

66.     Morantes then advised he wanted to look for houses in the Sacramento area but changed his story saying he had not looked online yet.

67.     Morantes advised he did not talk to a realtor yet, but was going to get one when he arrived in Sacramento.

68.     SA Neal asked Morantes if he knew his credit score, and Morantes hesitated, but then advised his credit score is about 700.

69.     SA Neal asked if he obtained a pre-qualification for purchasing a house, and Morantes stated he had not.

70.     SA Neal asked Morantes where he obtained this money, and Morantes advised he got it legally and it was clean money.

71.     Morantes stated he got the money from online resales of all types of merchandise and that he sold the merchandise on Amazon under the name of BOBG Discounts.

72.     Morantes stated the company sold close to $100,000.00 last year, but he was not sure how much the company sold this year because the company's account was

on hold.  Morantes stated the company's account has been on hold for the past couple of months.

73.     Morantes was asked if the currency in his backpack was any different from the money inside of his carry-on roller bag, and Morantes replied no.

74.     The money was removed from the roller bag and put with the money from his backpack, to be subjected to a K-9 sniff test.

75.     SA Neal asked Morantes if the cash he was carrying came from a bank, and Morantes stated the cash came from withdrawals from TD Bank over the past year, little by little, which he stored in a safe at his house.

76.     Morantes advised he is also trying to buy a car back home.

77.     SA Neal asked why Morantes would bring cash he was going to use to buy a car in Florida to California, and Morantes stated he was just saying that and that the future car purchase had nothing to do with the currency in his possession.

78.     Morantes advised the currency he was carrying was his savings.

79.     SA Neal asked Morantes why he would take all of his cash out of the bank when it would look better to have the cash in the bank when trying to buy a house, and Morantes agreed and advised he still has activity (referring to bank activity).

80.     Morantes then said he does not have much in this his account now, maybe a couple hundred dollars.

81.     Morantes advised this was his third trip to Sacramento.

82.     SA Neal asked Morantes if he was ever arrested, and Morantes stated he was arrested for possession of marijuana.

83.     SA Neal asked Morantes when was the last time he spoke to his uncle about

10

visiting Sacramento, and Morantes said he spoke to his uncle a couple of weeks ago.

84.     Morantes again advised SA Neal it was not his real uncle, just someone he called uncle.  SA Neal asked Morantes how he knew this person, and Morantes stated he met him through a close friend.  SA Neal asked who the close friend was, Morantes said Alex but he did not know his last name.

85.     SA Neal asked for Alex's phone number, and Morantes stated he did not know Alex's phone number because Morantes had a new phone that did not have Alex's phone number in it.

86.     SA Neal asked Morantes why he hid the currency in the lining of his bag, and Morantes said he hid it for safety.

87.     SA Neal asked Morantes why he lied when asked if he was carrying any large amounts of currency, and Morantes stated, "it was just at the heat of the moment" and he was just nervous, not wanting to get in trouble.

88.     SA Neal asked who the boss of BOBG Discounts is, and Morantes said he was the boss.

89.     Morantes advised that he used a debit card for expenses when the company had money in the account.

90.     Morantes stated he sold appliances, electronics and other items that he bought from Walmart and resold them on www.amazon.com.

91.     Morantes stated he has receipts from Walmart.

92.     SA Neal asked why people don't just buy from Walmart, and Morantes said people buy on www.amazon.com because of the name.

93.     SA Neal asked if he could look at Morantes's phone to see if there were

any text messages or other information related to his trip, and Morantes declined to allow SA Neal to look at his phone.

94.     SA Neal asked Morantes if he was on probation, and Morantes said "no" but then advised he checks in with a probation officer.

95.     Morantes advised his probation officer was Lashell from Fort Lauderdale and that she authorized Morantes to be on this trip and carrying $60,000.00.

96.     A K-9 sniff test on the currency in Morantes's possession to check for the odor of an illicit drug was conducted.  The K-9 had a positive alert on the currency, indicating the dog could smell one of the four odors the dog is trained to detect (cocaine, heroin, methamphetamine, and marijuana).

97.     The K-9 is a "sophisticated drug dog" that alerts to the odor of currency that had been in recent close proximity to a narcotic substance for which the dog is trained to detect and does not alert to currency in general circulation.

98.     Morantes asked if he could call his lawyer, and SA Neal allowed Morantes to use Morantes's phone to complete a call to "Falaka." His phone number 561-789-3200.

99.     While completing the call, Morantes voluntarily put the call on speakerphone.  SA Neal did not ask Morantes to put his call on speakerphone.

100.    The attorney was concerned about Morantes signing any documents.

101.    SA Neal advised the attorney that he was only requesting that Morantes sign a receipt documenting that SA Neal seized the U.S. currency from Morantes.

102.    The U.S. currency was counted.  Morantes had $63,929.00 U.S. currency in his possession.

103.    A records check revealed Morantes had a criminal history that included:

    a.  Arrested 8/05/2015, Possession of Paraphernalia, Felony Possession of Cannabis over 20 Grams / Convicted Marijuana Possession, Sentenced 1 month 25 Days Confinement.

    b.  Arrested 8/14/2015, Trespassing, Felony Possession of Cannabis over 20 Grams / Convicted Marijuana Possession, Sentenced 10 Days Confinement.

    c.  Arrested 8/30/2018, Felony Possession of Cannabis over 20 Grams / Convicted Marijuana Possession, Sentenced Probation 24 months.

    d.  Arrested 10/07/2018 Possession of Paraphernalia, Felony Possession of Cannabis over 20 Grams, Possession of THC / Unknown Disposition.

    e.  Arrested 12/19/2018 Possession of THC, Felony Possession of Cannabis over 20 Grams / Convicted Marijuana Possession, Sentenced Probation 12 months.

### *Interview with Alfredo Vasquez*

104.    Vasquez was consensually contacted by Task Force Officer Richard Lamberto ("TFO Lamberto") while SA Neal was speaking with Morantes.

105.    Vasquez was contacted in an open, public walkway where he was able to walk away if he chose to do so.

106.    Vasquez told TFO Lamberto he was in possession of approximately $3,000.00.

107.    TFO Lamberto asked Vasquez if he had any money inside of his suitcase, and Vasquez said no.

108.    TFO Lamberto requested and received consent to search Vasquez's suitcase.

109.    During a consent search of Vasquez's suitcase, United States currency was located concealed inside the lining of the bag.

110.    Vasquez initially claimed to be unaware of the currency.

111.   TFO Lamberto requested that Vasquez accompany TFO Lamberto to the airport CNIU office to discuss the currency, and Vasquez complied.

112.   Vasquez could not provide TFO Lamberto with an exact amount of money with which he was travelling.

113.   The money inside his suitcase was found to be $59,900.00.

114.   Vasquez also was carrying $3,000.00, or a total of $62,900.

115.   TFO Lamberto knows it is common for money couriers to be deceitful about the amount of money they are carrying to minimize suspicion from law enforcement.

116.   Additionally, money couriers who are transporting currency on another's behalf often are unaware of the exact amount money they have.

117.   Vasquez told TFO Lamberto the currency was from gambling winnings, and because it was a significant amount Vasquez said he was under the assumption there was a specific amount of money he was allowed to travel with.  Therefore, Vasquez said he put the money inside the lining to avoid any scrutiny.

118.   Vasquez said the money was accumulated over a three-year time period, which he earned from gambling.

119.   Vasquez explained he kept the money at his house rather than depositing it in a bank

120.   Vasquez said he does not have a full-time job but helps his father with construction on occasion.

121.   Vasquez lacked documentation or gambling receipts for the source of and intended use of the money.

14

122.    Vasquez's income from employment is inconsistently low in comparison to the amount of money he possessed.

123.    TFO Lamberto requested and received consent to search Vasquez's cell phone.

124.    During the consent search of Vasquez's cell phone, TFO Lamberto observed Vasquez had text messages indicative of drug sales, specifically marijuana, Xanax pills, and had photos and videos of a significant amount of marijuana packaged for sale.

125.    TFO Lamberto knew from a criminal history query that Vasquez had prior drug arrests in Florida for possession with intent to deliver methaqualone; possession with intent to deliver marijuana; weapon in a drug offense (2016); possession of a controlled substance; and possession of cocaine (2018).

126.    A narcotics K-9 conducted a sniff test of the currency in Vasquez's possession with negative results.

127.    A records check was conducted which revealed Vasquez's following criminal history:

    a.  Arrested 3-30-2016, Possession with Intent to Distribute Marijuana, Possession with Intent to Deliver Methaqualone, Possession with Intent to Deliver Marijuana, Weapon in a Drug Offense / Convicted-Sentenced to 63 days Confinement, 6 years community control.

    b.  Arrested 7-14-2009 Possession of Marijuana, Possession of a Controlled Substance; Possession of Cocaine / Disposition-DJJ Supervision.

128.    On December 9, 2019 and December 20, 2019, Vasquez and Morantes, respectively, submitted claims to the DEA requesting a judicial determination regarding forfeiture of the Defendant Properties.

129.    SA Neal learned Morantes was on probation in Florida.    SA Neal communicated with Morantes's probation officer, who informed SA Neal that Morantes had not been authorized by her to travel and later informed SA Neal that she believed Morantes worked for 4 Seasons Lawn Service.

130.    SA Neal contacted 4 Seasons Lawn Service and was told that Morantes worked there as a crew leader and that he worked there for about a year but could not provide an exact start date.

131.    As part of his ongoing investigation of Morantes and the seizure of the currency from him, on February 11, 2020, SA Neal sent an email to Morantes's attorney and requested certain information and documentation, including but not limited to:

   a.   The identity of Morantes's employers since January 1, 2016 and how much he earned from each employer;

   b.   Copies of Morantes's tax returns with attachments and W-2 forms since January 1, 2016;

   c.   The identity of bank accounts that Morantes had since January 1, 2016, and copies of bank statements;

   d.   The identity of the uncle who Morantes stated he would be seeing in Sacramento;

   e.   The identity of "Alex" who Morantes stated was his friend and who introduced him to his uncle in Sacramento;

   f.   The purpose of Morantes' trip to Sacramento and the identity of those he planned to meet while in Sacramento;

   g.   The reason why Morantes was carrying $63,929 in cash on the day of the seizure;

   h.   The location of the place in Sacramento where Morantes stated he intended to "stash" the seized money;

   i.   The location of the house(s) in Sacramento that that on the date of the seizure Morantes stated he intended to buy in the $300,000 to $400,000

price range and the identity; when he learned such house(s) was for sale; and the identity of any realtor who was to assist him in buying a home in Sacramento;

j.  An explanation of how Morantes acquired the seized money and copies of all documentation evidencing how he acquired it;

k.  Financial and banking records of BOBG Discounts, which on the date of the seizure Morantes stated was his business through which he bought retail items and then resold them on Amazon; and

l.  Copies of the statements from TD Bank account from which on the date of the seizure Morantes stated that the seized money had been withdrawn.

132.    SA Neal asked Morantes's attorney to provide the requested information and documents by February 21, 2020.

133.    On February 20, 2020, SA Neal received from Morantes's attorney Morantes's TD Bank business banking statements for BOBG Discounts, Inc. for April 24, 2018 through August 31, 2018 and September 19, 2018 through March 31, 2019.

134.    To date, the TD Bank statements are the only information or documentation that SA Neal received in response to his request.

135.    While the TD Bank statements do indicate that Morantes bought items, primarily at Walmart, and then re-sold them on Amazon, the vast majority of the debits were for the cost of goods and very little was withdrawn from in cash from the account.

136.    Moreover, the TD Bank statements indicate that Morantes stopped selling on Amazon approximately a year before the seizure and that he earned little or no profit on his Amazon sales, or at least did not earn enough net income to pay normal living expenses, much less acquire over $60,000 in cash that was seized.

137.    As part of his ongoing investigation of Vasquez and the seizure of the currency from him, on February 11, 2020, SA Neal sent an email to Vasquez's attorney

17

and requested certain information and documentation, including but not limited to:

  a. The identity of Vasquez's employers since January 1, 2016 and how much he earned from each employer;

  b. Copies of Vasquez's tax returns with attachments and W-2 forms since January 1, 2016;

  c. The identity of bank accounts that Vasquez had since January 1, 2016, and copies of bank statements;

  d. The identity of the casinos where, on the date of the seizure, Vasquez stated that he won the money he was carrying;

  e. The identity of Vasquez's father, who on the date of the seizure Vasquez stated he occasionally worked for in construction and how much he earned working for his father since January 1, 2016;

  f. The purpose of Vasquez's trip to Sacramento and the identity of those he planned to meet while in Sacramento;

  g. The reason why Vasquez was carrying $62,900 in cash on the day of the seizure; and

  h. An explanation of how Vasquez acquired the seized money and copies of all documentation evidencing how he acquired it.

138. SA Neal asked Vasquez's attorney to provide the requested information and documents by February 21, 2020.

139. To date, SA Neal has not received any of information or documents that he requested from Vasquez's attorney.

140. Both Morantes and Vasquez were deceptive when investigators initially asked if they were carrying large amounts of currency with them.  They stated they were not traveling with any large amounts of currency, when in fact they were in possession of $63,929.00 and $62,900.00 respectively.

141. Drug trafficking organizations sometimes have money carriers who are transporting illegal criminal proceeds separate or try to minimize the amount of money

each courier is transporting to try to minimize the potential for discovery of all the money in their possession by law enforcement personnel.  Both Morantes and Vasquez stated they did not have any large amounts of currency in their possession, yet they were in possession of $63,929.00 and $62,900.00 in U.S. currency, respectively.

142.    Based on, among other things, Morantes's and Vasquez's last minute ticket purchases; the ticket tips; the fact that they but were travelling together; they were walking together, talking, and sitting in the airport together; their flight itineraries were the same and they were seated near each other; they were carrying similar large amounts of money, each in a carry-on roller bag, with the money hidden in the same, unique way - in the back lining of the carry-ons as if the currency was padding of the carry-on; their lying about carrying the currency; their differing, inconsistent stories about their travel plans; the destination/source relationship of travel, and prior drug-related criminal history; and their lack of a legitimate source of the money in their possession, the currency seized from Morantes and Vasquez is the proceeds of drug trafficking or traceable to such proceeds or is property involved in money laundering of a specified unlawful activity, including drug trafficking.

143.    Morantes's flight history with American Airlines is as follows:
- i.   February 11, 2018 – Los Angeles to Miami
- ii.   June 13, 2018 – Miami to Los Angeles
- iii.   June 27, 2018 - Los Angeles to Miami
- iv.   August 10, 2018 – Miami to Los Angeles
- v.   August 20, 2018 - Los Angeles to Miami
- vi.   March 26, 2019 – Miami to Los Angeles
- vii.   April 2, 2019 - Los Angeles to Miami
- viii.   June 11, 2019 – Miami to Los Angeles

ix.  July 28, 2019 – Miami to Sacramento

x.  September 16, 2019 – Miami to Sacramento

xi.  September 17, 2019 – Sacramento to Miami

144.   Morantes's flight history with American Airlines is indicative of drug trafficking for several reasons, such as his frequent flights between a drug source location, California, and a drug destination location in Florida, and the little time he spent in the drug source location. Also, Morantes booked his flights on the same day of, or shortly before, his flights.  By way of example, on September 16, 2019 and September 17, 2019, Morantes flew back and forth from Miami to Sacramento in two days' time. Moreover, given Morantes's limited income and wages, he does not have sufficient legitimate income to afford all of these flights, much less other flights that are not listed above.

145.   Vasquez's flight history includes flying on American Airlines from Miami to Sacramento on July 28, 2019, the same date that, as noted above, Morantes flew from Miami to Sacramento.

146.   Based on, among other things, Morantes's and Vasquez's last minute ticket purchases; the ticket tips; the fact that they but were travelling together; they were walking together, talking, and sitting in the airport together; their flight itineraries were the same and they were seated near each other; they were carrying similar large amounts of money, each in a carry-on roller bag, with the money hidden in the same, unique way - in the back lining of the carry-ons as if the currency was padding of the carry-on; their lying about carrying the currency; their differing, inconsistent stories about their travel plans;  the  destination/source  relationship  of  travel,  and  prior  drug-related  criminal

history; their lack of a legitimate source of the money in their possession; and their inability to provide information and documents in response to SA Neal's request that would indicate the Defendant Properties came from a legitimate and legal source, the currency seized from Morantes and Vasquez is the proceeds of drug trafficking or traceable to such proceeds or is property involved in money laundering of a specified unlawful activity, including drug trafficking.

## FIRST CLAIM FOR RELIEF

The Defendant Properties were furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, or constitute proceeds traceable to such an exchange, or were used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and therefore are subject to forfeiture to the United States pursuant to 21 U.S.C. § 981(a)(1)(A).

## SECOND CLAIM FOR RELIEF

The Defendant Properties constitute or are derived from proceeds traceable to a violation of a specified unlawful activity, including but not limited to dealing in a controlled substance and  to a violation of 18 U.S.C. § 1952, travel in interstate commerce with the intent to distribute proceeds of unlawful activity or to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, and therefore are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## NOTICE TO ANY POTENTIAL CLAIMANT

If you assert an interest in the subject property and want to contest the forfeiture, you must file a verified claim that fulfills the requirements set forth in Supplemental Rule G. To avoid entry of default, a verified claim must be filed no later than thirty-five days from the date this Complaint has been sent in accordance with Supplemental Rule G(4)(b).

An answer or motion filed under Fed. R. Civ. P. 12 also must be filed no later than twenty-one days after filing the claim. The claim and answer must be filed in the United States District Court for the District of Arizona under the case number listed in the caption above and a copy must be served upon the undersigned Assistant United States Attorney at the address provided in this Complaint.

This notice provision does not provide you with any legal advice and is designed only to provide you with a general understanding of these proceedings. Any statements made in your claim or answer may be introduced as evidence against you in any related or future criminal case. You should consult an attorney to represent your interests in this matter, and note that a stay of proceedings may be available under 18 U.S.C. § 981(g)(2).

IF YOU ARE A VICTIM, and have sustained economic loss as a result of the crime(s) giving rise to this civil action, you may be entitled to petition for remission, mitigation, or restoration under Title 28, Code of Federal Regulations ("C.F.R."), section 9.2. In lieu of filing a Claim with the Court, you may promptly submit a letter outlining your interest in the property to the undersigned Assistant United States Attorney. Plaintiff will notify you when it has received your letter, and further instructions may be provided upon conclusion of this action. The United States Attorney General shall have sole responsibility for disposing of petitions for remission or mitigation with respect to property involved in a judicial forfeiture proceeding under 18 U.S.C. § 981(d) and 21

U.S.C. § 881(d). If your status as a victim is contested, timely receipt of your letter will not shield you from entry of default for failing to file a proper claim with the Court.

IF YOU ARE A LIENHOLDER, it is the policy of the United States Attorney's Office to honor all claims received from legitimate titled lienholders as defined under 28 C.F.R. § 9.2. In lieu of filing a claim with the Court, you may send a letter to the undersigned Assistant United States Attorney outlining your interest in the property, including: (1) the amount presently owed on the lien; (2) a copy of the security agreement setting forth your interest; and, (3) whether the owner is in default. If your lien is sufficient, Plaintiff will notify you to verify receipt of your letter. In the event of forfeiture, and to the extent practicable, proceeds from the sale and disposition of the subject property will be remitted to you in satisfaction of the lien. As noted above, timely receipt of your letter will not shield you from entry of default for failing to file a proper claim with the Court.

### **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the Defendant Properties; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendant Properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 30th day of April, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*S/ Mark J. Wenker*
MARK J. WENKER
Assistant United States Attorney

## **VERIFICATION**

I, William S. Neal, verify and declare under penalty of perjury that I am a Special Agent with the Drug Enforcement Administration, that I have read the foregoing Complaint for Forfeiture *In Rem* and know the contents, and that the matters contained in the Complaint are true to my own knowledge, except that those matters alleged upon information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

I verify and declare under penalty of perjury that the foregoing is true and correct. Executed on this 29th day of April, 2020.

SA William S. Neal
William S. Neal, Special Agent
Drug Enforcement Administration

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the District of Arizona.

**The completed cover sheet must be printed directly to PDF and filed as an attachment to the Complaint or Notice of Removal.**

---

**Plaintiff**(s): **United States of America**

County of Residence: Maricopa

County Where Claim For Relief Arose: Maricopa

Plaintiff's Atty(s):

**Mark Wenker , Assistant U.S. Attorney**
**U.S. Attorney's Office**
**40 N. Central Ave., Ste. 1800**
**Phoenix, Arizona  85004**
**602-514-7500**

**Defendant**(s): **$62,900.00 in U.S. Currency and $63,929.00 in U.S. Currency**

County of Residence: Maricopa

Defendant's Atty(s):

---

II. Basis of Jurisdiction:     **1. U.S. Government Plaintiff**

III. Citizenship of Principal Parties
**(Diversity Cases Only)**

Plaintiff:- **N/A**
Defendant:- **N/A**

IV. Origin :     **1. Original Proceeding**

V. Nature of Suit:     **690 Other**

VI.Cause of Action:     **18 U.S.C. Section 981(a)(1)(C) 18 U.S.C. Section 1952**

VII. Requested in Complaint

Class Action:**No**
Dollar Demand:
Jury Demand:**No**

VIII. This case **is not related** to another case.

---

**Signature:  S/ Mark Wenker**

**Date:  04/30/2020**

**If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, save this form as a PDF and include it as an attachment to your case opening documents.**

Revised: 01/2014